**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**NANCY F. KING, on behalf of S.S.K.,**

     **Plaintiff,**

**vs.**                                                                                    **Case No.: 8:10-CV-2930-T-27EAJ**

**COMMISSIONER OF SOCIAL SECURITY,**

     **Defendant.**

_____/

## REPORT AND RECOMMENDATION

     Plaintiff, on behalf of her minor child, S.S.K. ("Claimant"), brings this action pursuant to the Social Security Act (the "Act"), as amended, Title 42, United States Code, Section 405(g), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") terminating S.S.K.'s claim for Supplemental Security Income ("SSI"). The undersigned has reviewed the record, including a transcript of the proceedings before the Administrative Law Judge ("ALJ"), the administrative record, and the pleadings and memoranda submitted by the parties in this case.

     In an action for judicial review, the reviewing court must affirm the decision of the Commissioner if it is supported by substantial evidence in the record as a whole and comports with applicable legal standards. See 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983). If there is substantial evidence to support the Commissioner's findings, this court may not decide the facts anew or substitute its judgment as to the weight of the evidence for that of the Commissioner. See Goodley v. Harris, 608 F.2d 234, 236 (5th Cir. 1979).

If the Commissioner committed an error of law, the case must be remanded to the Commissioner for application of the correct legal standard.  See Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).  If the reviewing court is unable to determine from the Commissioner's decision that the proper legal standards were applied, then remand to the Commissioner for clarification is required.  See Jamison v. Bowen, 814 F.2d 585, 588 (11th Cir. 1987).

A child under the age of eighteen is considered disabled if she has a medically determinable physical or mental impairment (or combination of impairments) that causes marked and severe functional limitations and that can be expected to cause death, or that has lasted (or can be expected to last) for a continuous period of not less than twelve months.  20 C.F.R. § 416.906.  The Social Security Administration has established a three-step evaluation process to determine whether a child under the age of eighteen is disabled.  Id. § 416.924(a)-(d).  The first step is to determine whether the child is engaged in substantial gainful activity.  Id. § 416.924(b).  If the child is not engaged in substantial gainful activity, the second step is to determine whether the child has a medically determinable severe impairment or combination of impairments that is severe.  Id. § 416.924(c).  Third, if it is determined that the child has a severe impairment, the examiner must determine whether the child's impairment or combination of impairments meets, medically equals, or functionally equals a listed impairment in 20 C.F.R. Pt. 404, Subpart P, Appendix 1.  Id. § 416.924(d).  The examiner must consider the combined effect of all medically determinable impairments.  Id. § 416.923.

To determine whether an impairment or combination of impairments functionally equals a listing, the examiner evaluates the child's functioning in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving

2

about and manipulating objects; (5) caring for yourself; and (6) health and physical well being.  Id. § 416.926a(b)(1).  These six domains must be evaluated by comparing the child to other children of the same age who do not have impairments.  Id. § 416.926a(b).  If the child has an extreme limitation in one of these domains, or marked limitations in two of them, a finding of functional equivalence will be made.  Id. § 416.926a(d).  An extreme limitation is one that "very seriously" interferes with a child's ability to independently initiate, sustain, or complete activities, and a marked limitation is one that "seriously" interferes with these abilities.  Id. § 416.926a(e)(2)(I), (e)(3)(I).

In a cessation of benefits case, such as the case at hand, the evaluation is applied using a modified standard.  The Commissioner must first consider whether there has been medical improvement in the child's impairment.  Id. § 416.944a(a)(1).  In a child's disability claim, medical improvement means a "decrease in the medical severity of [the child's] impairment(s) which was present at the time of the most recent favorable decision that [the child was] disabled or continued to be disabled."  Id. § 416.994a(c).  If there has been medical improvement, the Commissioner must consider whether the impairments the child had at the time of the most recent favorable determination or decision now meets or medically or functionally equals the severity of the listing it met or equaled at that time.  Id. § 416.994a(a)(1).  If that impairment does not still meet or equal the severity of that listed impairment, the Commissioner will consider whether the child is currently disabled based on the current impairments, including any the child did not have at the time of the most recent favorable determination.  Id. § 416.994a(b)(3).

### Background

In September 2000, Plaintiff filed an application for SSI on behalf of S.S.K.  (T 10)  The Commissioner determined that S.S.K. was disabled as of September 21, 2000. (T 10, 452) Pursuant

to a continuing disability review, the Commissioner subsequently determined that S.S.K. was no longer under a disability as of May 2005. (T 10, 60, 452)[1] Plaintiff requested a hearing before an ALJ, and a hearing was held on June 26, 2006. (T 47, 378) On September 1, 2006, the ALJ affirmed the finding that S.S.K. was no longer disabled as of May 2005. (T 22) Plaintiff appealed the decision to the district court, and the district court remanded the case to the Commissioner for consideration by a different ALJ. (T 450)[2]

Following remand, a hearing was held on June 8, 2009 before a second ALJ. (T 703) On August 31, 2009, the second ALJ denied Plaintiff's application. (T 439) The ALJ found that S.S.K. experienced medical improvement as of May 1, 2005, and her impairment no longer met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, App. 1. (T 425, 428) The ALJ also found that since May 1, 2005, S.S.K. experienced the severe impairments of attention deficit hyperactivity disorder ("ADHD"), bipolar disorder, and a history of post-traumatic stress disorder, but that these impairments, individually or in combination, did not meet or medically equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, App. 1. (T 429) S.S.K. was assigned the following limitations in the six functional domains:

| | |
|---|---|
| Acquiring and using information | Less than marked limitation |
| Attending and completing tasks | Less than marked limitation |
| Interacting and relating with others | Less than marked limitation |
| Moving about and manipulating objects | No limitation |
| Caring for yourself | No limitation |

---

[1] Specifically, the ALJ found that at the time S.S.K. was determined to be disabled, S.S.K. experienced problems with aggression, oppositional behavior, attention deficits, and impulsivity, but since that time, the medical evidence showed that S.S.K.'s behavior problems had improved and she was doing well with medication. (T 12-14)

[2] Remand was ordered because the ALJ's decision was not supported by substantial evidence. (T 445)

Health and physical well-being                No limitation

(T 434-38)  Because S.S.K. did not have marked limitations in two or more domains or an

extreme limitation in at least one domain, S.S.K. was found not disabled.  (T 439)  On December

2, 2010, the Appeals Council denied review of the ALJ's decision, making it the final decision of

the Commissioner.  (T 407)

## Discussion

Plaintiff challenges the ALJ's findings that S.S.K. had less than marked limitations in the

functional domains of acquiring and using information, interacting and relating with others, and

caring for yourself.  Plaintiff also argues that the case should be remanded because: (1) the ALJ

failed to consider the longitudinal record; (2) the ALJ failed to specify the weight given to various

medical opinions, particularly the opinion of Carol Sevlie, A.R.N.P., a nurse practitioner; (3) the ALJ

erred in discrediting the testimony of Plaintiff and S.S.K.'s stepfather, David Hayward; (4) the ALJ

failed to consider S.S.K.'s testimony from her hearing before the first ALJ on June 26, 2006; and (5)

the ALJ erred in giving great weight to the opinion of a state-agency disability hearing officer.

Plaintiff submits that the case should be remanded for an immediate award of benefits.

**1.     Summary of the Medical Evidence**

Plaintiff's treating physicians included Dr. Aftab Qadir, M.D. ("Dr. Qadir") of Tri-County

Psychiatric Associates, a board certified child and adolescent psychiatrist.  (T 426)  Dr. Qadir's

progress notes from December 23, 2003 state that S.S.K. was doing well at home with no major

problems.  (T 540)  S.S.K.'s medication was helping, but she still experienced difficulties at school.

(Id.)  Dr. Qadir evaluated Plaintiff's Global Assessment of Functioning as 68.[3]  Dr. Qadir's impressions included: (1) ADHD; (2) depressive disorder; and (3) problems at school.  (Id.)

Dr. Qadir's progress notes from January 2004 to May 2005, spanning approximately fifteen visits, consistently report that S.S.K.'s hygiene and grooming were fair, her speech was normal, her recent memory was intact, and her intelligence was average.  (T 232-59, 541)  However, she exhibited reduced insight and judgment.  (Id.)  The progress notes occasionally report that S.S.K. had problems with school and anger issues.  (T 234, 236, 238, 240, 252, 254)  Dr. Qadir found no signs of suicidal and homicidal ideations.  (Id.)  Dr. Qadir's impressions included ADHD, depression, and bipolar disorder, and S.S.K. was treated with multiple medications, including Depakote, Ritalin, Concerta, and Seroquel.  (T 230, 233-59, 542)

On March 8, 2005, Plaintiff reported to Dr. Qadir that S.S.K. was doing better, and her therapy was helping.  (T 537)  Though she became angry at times, S.S.K.'s mood was stable with medication. (Id.)  S.S.K. denied experiencing any side effects from her medication.  (Id.)  On June 10, 2005, Plaintiff again told Dr. Qadir that S.S.K. was doing better with no major problems or complications at school.  (T 535)  S.S.K. was irritable at times, but she remained retractable.  (Id.)  S.S.K. had no medication side effects.  (Id.)  On both visits, S.S.K.'s mood was described as labile but pleasant.  (T 535, 537)

On March 24, 2005, S.S.K. underwent a psychological evaluation with IQ and achievement

---

[3]  GAF is a standard measurement of an individual's overall functioning level with respect to "psychological, social, and occupational functioning."  American Psychiatric Assoc. Diagnostic and Statistical Manual of Mental Disorders at 30 (4th ed. 1994) [hereinafter DSM-IV-TR].  A GAF score of 61-70 reflects "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  Id. at 34.

testing conducted by David Yowell, M.A., a psychology resident working under the supervision of Darlene Beers, Psy.D., a licensed psychologist. (T 217-21) Plaintiff and S.S.K.'s stepfather were present during the evaluation. (T 218)

At the time, S.S.K. lived with her mother, stepfather, and younger brother. (T 217) Plaintiff reported that S.S.K. was physically abused by her father, and S.S.K. witnessed her father physically and sexually abuse Plaintiff. (T 217-18) According to Plaintiff, S.S.K. was placed in foster care when she was eight years old because of the abuse, and her father was eventually incarcerated. (Id.) S.S.K. was in foster care for two years before Plaintiff regained custody in 2002. (T 217) Mr. Yowell noted that the dates provided by Plaintiff for S.S.K.'s placement in foster care were inconsistent with dates listed in records from the Florida Division of Disability Determinations. (T 219) Despite Plaintiff's reports of abuse, S.S.K. denied being abused or witnessing abuse, and she denied experiencing the symptoms described by her mother and stepfather (Id.)

Plaintiff revealed that she had five other children who were all adopted at birth due to her cocaine use, but she had not used cocaine since 1996. (T 217) Plaintiff admitted to using cocaine while pregnant with S.S.K. (T 218)

S.S.K. was appropriately dressed and groomed with good basic functioning and hygiene. (Id.) S.S.K. was quiet throughout the interview and periodically sucked her thumb. (Id.) But she was alert and oriented with logical and coherent thought processes. (T 219) S.S.K. had no articulation problems, but her affect was often childlike and inconsistent with the topic. (Id.) S.S.K. did not show any signs of suicidal or homicidal ideation. (Id.)

Plaintiff told Mr. Yowell that S.S.K. had difficulty initiating and maintaining friendships because of irritability, anger, and occasional withdrawal from others. (Id.) However, S.S.K.'s social

life was described as somewhat active, and she had several friends at school.  (Id.)

S.S.K. was cooperative, and she appeared to put forth her best efforts during testing.  (Id.)
Test results indicated that S.S.K.'s intellectual functioning was in the borderline range, and the
results did not demonstrate a learning disorder.  (T 220)  Mr. Yowell opined that S.S.K.'s prognosis
was fair with treatment, and he evaluated her GAF score as 48.[4]  (Id.)  Mr. Yowell's impressions
included: (1) post-traumatic stress disorder; (2) a history of physical abuse; (3) a witness to domestic
violence and sexual abuse; (4) discord with peers and teachers; and (5) academic problems.  (Id.)

An April 24, 2005 childhood disability evaluation by Dr. James Mendelson, Ph.D. ("Dr.
Mendelson"), found that S.S.K. experienced the following degrees of limitations in the six functional
domains: (1) no limitations in acquiring and using information; (2) less than marked limitations in
attending and completing tasks; (3) less than marked limitations in interacting and relating with
others; (4) no limitations in moving about and manipulating objects; (5) no limitations in caring for
herself; and (6) no limitations in health and physical well-being.  (T 225-26)  Dr. Mendelson
concluded that S.S.K.'s medical condition had improved since her original onset date.  (T 223)

On June 7, 2005, S.S.K. was treated by Dr. Rubina Inayat, M.D. ("Dr. Inayat").  (T 260, 267,
536)  Both S.S.K. and her mother reported that S.S.K. was doing better with medication, and the
medication stabilized her mood.  (Id.)  S.S.K. sometimes lost her temper and started throwing things
when she did not get her way, but she did not hit or hurt anyone.  (Id.)  S.S.K.'s energy and interest
were good, she was polite and pleasant, and there were no signs of suicidal or homicidal ideations.
(Id.)  S.S.K. sucked her thumb during the examination even after her mother told her to stop.  (Id.)

---

[4]  A GAF score of 41-50 reflects "[s]erious symptoms (e.g., suicidal ideation, severe
obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or
school functioning (e.g., no friends, unable to keep a job)."  DSM-IV-TR at 34.

Progress notes from July 5, 2005 again report that S.S.K. was doing much better, and her mood was good. (T 278, 534) There were no mood swings, agitation, mania, hypermania, psychosis, or suicidal or homicidal ideations. (Id.) S.S.K. was less irritable and listened better with medication. (Id.) Plaintiff stated that missing one day of medication was a problem for S.S.K. (Id.)

A July 14, 2005 childhood disability evaluation by Dr. Sharon Ames-Dennard, Ph.D. ("Dr. Ames-Dennard") found that S.S.K. experienced severe nonexertional impairments, but her impairments did not meet or medically or functionally equal a listing. (T 261) Dr. Ames-Dennard also found that S.S.K. experienced: (1) no limitations in acquiring and using information; (2) no limitations in attending and completing tasks; (3) less than marked limitations in interacting and relating with others; (4) no limitations in moving about and manipulating objects; and (5) no limitations in caring for herself.[5] (T 263-64)

S.S.K. was also treated by Carol Sevlie, A.R.N.P., a nurse practitioner with Tri-County Psychiatric Associates. (T 272, 274-76, 526-32) On February 12, 2006, Ms. Sevlie completed a disability questionnaire at the request of Plaintiff's attorney. (T 279-80, 543) Ms. Sevlie reported that S.S.K. experienced: (1) marked limitations in acquiring and using information; (2) extreme limitations in attending and completing tasks; (3) extreme limitations in interacting and relating with others; (4) no limitations in moving about and manipulating objects; (5) marked limitations caring for herself; and (6) less than marked limitations in health and physical well being. (T 280, 543)

Treatment notes from February 21, 2006 report that S.S.K.'s grades were failing, and S.S.K. was experiencing problems with anger, attention, and concentration. (T 274) A mental status

---

[5] Dr. Ames-Dennard did not make a finding with respect to the domain of health and physical well-being. (T 264)

examination showed that S.S.K.'s speech was logical and coherent, her affect was euthymic, and her insight, judgment, concentration, and memory were fair.  (Id.)  S.S.K. was described as pleasant and cooperative.  (Id.)  In March 2006 and May 2006, Plaintiff related that S.S.K. was doing well with no medication side effects.  (T 275-76)

On July 27, 2006, Ms. Sevlie reported that S.S.K.'s insurance would no longer pay for long-acting Ritalin, so S.S.K. would have to be placed on immediate-release Ritalin.  (T 532)  But Ms. Sevlie was concerned that if S.S.K.'s medication was switched, she might not remember to take her medication during school hours.  (Id.)  S.S.K. did not speak during the examination, but she was smiling and pleasant with no suicidal or homicidal ideation.  (Id.)  S.S.K.'s insight, judgment, memory, and concentration were reported as fair.  (Id.)

Ms. Sevlie treated S.S.K. four times from August 2006 to December 2006.  (T 528-31)  S.S.K.'s hygiene and grooming were fair, and her perception, insight, and judgment were unremarkable.  (Id.)  On three occasions S.S.K.'s mood and affect were unremarkable, and on one occasion S.S.K.'s mood was angry per her own report.  (Id.)

Ms. Sevlie also treated S.S.K. on February 29, 2007 and July 3, 2007.  (T 526-27)  S.S.K.'s thoughts were clear, and her insight and judgment were good.  (Id.)  S.S.K.'s mood was euthymic, her speech was normal, her appearance and grooming were good, and she was focused and attentive.  (Id.)  The February 2007 treatment notes state that S.S.K. was doing well and had no problems with her medications.  (T 527)  The July 2007 progress notes report that S.S.K. was admitted to Lakeside in June 2007 for threatening to kill herself and her mother, but S.S.K. was doing well since that time.  (T 526)

On May 11, 2007, S.S.K. underwent a clinical evaluation by Dr. Carmen Galano, Psy.D.

("Dr. Galano"), a postdoctoral resident working under the supervision of Rosimeri Clements, Psy.D., a licensed psychologist. (T 554-58) S.S.K.'s symptoms included hyperactivity, impulsiveness, depression, anger, and attention deficits. (T 554) S.S.K.'s anger caused her to throw things and hit people. (Id.) S.S.K. denied that she was currently getting into fights at school, but she admitted that she had been expelled and suspended from school in the past because of fighting and aggression. (T 554-55) S.S.K. stated that she currently had good relationships with peers and teachers and only fought at home with her mother and brother. (T 555) S.S.K. had a poor relationship with her family. (Id.)

Plaintiff admitted that she used cocaine during her pregnancy with S.S.K., but she had not used cocaine in thirteen years. (T 556) Plaintiff stated that all of her children were diagnosed with bipolar and ADHD. (Id.) S.S.K. denied being a victim of abuse. (Id.)

S.S.K. admitted that she was in a gang. (Id.) S.S.K. denied engaging in any gang-related violence, but she admitted to stealing. (Id.) Plaintiff stated that after S.S.K. came home from school, she would disappear and come home between 8 p.m. and 1 a.m. (T 554-55) S.S.K. denied using drugs or being sexually active. (T 555)

Plaintiff believed that S.S.K.'s therapy was effective, but Plaintiff denied any changes in S.S.K.'s behavior with treatment. (Id.) Plaintiff also denied that S.S.K.'s medication was effective. (T 554-56)

According to Plaintiff, S.S.K. had learning problems that were never diagnosed. (T 555) S.S.K. was repeating eighth grade, and Plaintiff believed that S.S.K. was performing below her grade level. (Id.) S.S.K. indicated that she was doing well in school and did not qualify for special education classes. (Id.) However, S.S.K. admitted that her current grades were Ds and Fs because

she did not want to do the work. (Id.) Plaintiff on the other hand, believed that S.S.K. did not understand the work. (Id.)

Dr. Galano reviewed a questionnaire completed by S.S.K.'s English teacher. (T 556) According to the teacher, S.S.K. showed no behavior problems, and she handled frustration and anger very well. (Id.) S.S.K. was able to work alone or cooperatively with others. (Id.) Further, she was able to stay on task, understand her work, and submit assignments. (Id.)

S.S.K. came to the evaluation appropriately dressed and well groomed with good basic functioning and hygiene. (Id.) S.S.K. was fidgety throughout the evaluation, but she answered the questions asked and did not display any oppositional tendencies. (Id.) Dr. Galano found that rapport was easy to establish. (Id.) S.S.K.'s thought processes were logical and coherent, her recent and remote memory were intact, and she had no articulation problems. (T 556-57) S.S.K. displayed a full range of appropriate affects. (T 557) S.S.K. stated that most of the time, her mood was angry, and her mother agreed. (Id.) S.S.K. was able to initiate friendships, but she had difficulty maintaining them because of her behavior. (Id.) S.S.K.'s social life was described as somewhat active, and her activities of daily living were age appropriate. (Id.)

Dr. Galano opined that S.S.K.'s prognosis was somewhat guarded. (Id.) Because of conflicting information in the record, Dr. Galano recommended further testing to determine if S.S.K. suffered from a learning disability or intellectual impairment. (Id.) Dr. Galano evaluated S.S.K.'s GAF as 55,[6] and Dr. Galano's impressions included: (1) bipolar disorder; (2) ADHD, predominantly hyperactive-impulsive type; (3) possible learning disorder; (4) possible intellectual impairment; (5)

---

[6] A GAF of 51-60 indicates either "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers)." DSM-IV-TR at 32.

in utero exposure to cocaine; (6) a history of academic and social difficulties; and (7) a history of abuse. (T 558)

On May 12, 2007, S.S.K. was involuntarily committed to Lakeside Behavioral Healthcare for holding a knife to Plaintiff during an argument and for being a potential harm to herself. (T 671, 674, 678) At admission, her GAF was assessed as 31,[7] and the diagnoses included ADHD (by history) and oppositional defiant disorder. (T 671) S.S.K. was discharged the next day, and her GAF had improved to 60. (T 664)

On June 10, 2007, S.S.K. was again involuntarily committed to Lakeside Behavioral Healthcare. (T 639) The second time, she was admitted for threatening to kill herself and her parents. (T 641, 644) S.S.K. had not taken her medications for three months prior to being admitted because the medication reportedly made her dizzy. (T 639, 644, 658, 661) S.S.K. was discharged two days later with a GAF of 65. (T 640-41)

On March 8, 2008, S.S.K. underwent a psychological evaluation conducted by Dr. Peter M. Bursten, Ph.D. ("Dr. Bursten"). (T 560) Dr. Bursten noted that S.S.K.'s appearance was unkempt, and her grooming and hygiene were substandard. (T 561) S.S.K. denied having a history of abuse. (Id.) S.S.K. was attending ninth grade, but her grades were failing. (Id.) S.S.K. reported behavior problems at school, including cursing at her teachers and skipping classes. (Id.)

S.S.K. described daily bouts of crying and depression, but she denied feeling helpless, hopeless, or having a low sense of self worth. (T 562) Although she once felt suicidal a year or two

---

[7] A GAF of 31-40 reflects "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." DSM-IV-TR at 32.

prior to the evaluation, she had never tried to hurt herself, and she denied having suicidal or homicidal ideations.  (Id.)  S.S.K.'s problems with anger caused her to throw objects and break them, and her personal relationships were unstable.  (Id.)  But her affect and mood were fully appropriate during the examination.  (Id.)

S.S.K.'s thinking was logical and goal oriented, and her memory was intact.  (T 561)  She did not display any attention deficits or hyperactivity during the evaluation, and Dr. Bursten found no evidence of a thought disorder.  (T 561-62)  Dr. Bursten opined that S.S.K.'s intellectual functioning fell at least in the upper end of the borderline range.  (T 561)  Dr. Bursten's diagnoses included: (1) depressive disorder; (2) disruptive behavior disorder; (3) ADHD (per history – symptoms were not evident during the evaluation); and (4) and borderline personality disorder.  (T 562)

A March 14, 2008 childhood disability evaluation by Dr. James Levasseur, Ph.D. ("Dr. Levasseur"), found that S.S.K. experienced severe nonexertional impairments, but her impairments did not meet or medically or functionally equal a listing.  (T 563)  Dr. Levasseur found that S.S.K. experienced: (1) less than marked limitations in acquiring and using information; (2) less than marked limitations in attending and completing tasks; and (3) marked limitations in interacting and relating with others.[8]  (T 565)

An April 24, 2008 childhood disability evaluation by Dr. Arthur Hamlin, Psy.D. ("Dr. Hamlin") also found that S.S.K. experienced severe nonexertional impairments, but that her impairments did not meet or medically or functionally equal a listing.  (T 569)  Dr. Hamlin found

---

[8] Dr. Levasseur did not make any findings with respect to the domains of moving about and manipulating objects, caring for yourself, or health and physical well being.  (T 566)

that S.S.K. experienced: (1) less than marked limitations in acquiring and using information; (2) less than marked limitations in attending and completing tasks; (3) less than marked limitations in interacting and relating with others; (4) no limitations in moving about and manipulating objects; (5) no limitations in caring for herself; and (6) no limitations in health and physical well being. (T 571-72)

An August 7, 2008 psychiatric evaluation by Dr. Theresa Voissem Ruano, D.O. ("Dr. Ruano") reports that S.S.K. was experiencing difficulties with focus and anger. (T 691) The symptoms began three days prior to the evaluation after S.S.K. ran out of medication. (Id.) Plaintiff maintained that when S.S.K. took her medication, she was focused, did not get angry, and listened well; S.S.K. agreed with this assessment. (Id.) Without her medication, however, S.S.K. was irritable and easily upset. (Id.) S.S.K. denied that the medication affected her sleep or appetite or that it caused headaches or stomachaches. (Id.) When relating S.S.K.'s patient history, Plaintiff denied in utero exposure. (Id.)

S.S.K.'s hygiene was fair, her speech was normal, and she was in a good mood. (T 692) Her thoughts were logical, coherent, and goal oriented, and her insight and judgment were fair. (Id.) Dr. Ruano assessed S.S.K.'s GAF as 55 with medication. (Id.) Dr. Ruano's diagnoses included: (1) ADHD; (2) mood disorder; and (3) a history of sexual abuse. (Id.)

Dr. Ruano's treatment notes from November 21, 2008 state that S.S.K. was expelled from school for skipping class. (T 597, 689) S.S.K. was having problems with attention, organizing, engaging in activities quietly, talking excessively, continuously moving about, and being disruptive in class. (T 689) She was casually dressed and smelled of body odor. (Id.) She was experiencing occasional headaches and stomachaches, and she was getting angrier since stopping her morning

dose of Depakote.  (Id.)

During a January 5, 2009 visit with Dr. Ruano, S.S.K. admitted that she was noncompliant with her medication.  (T 688)  She acknowledged that she was calmer and did not get moody when taking her medication.  (Id.)  S.S.K. was cooperative, and her mood was good.  (Id.)  Her grooming was good, and she denied experiencing headaches or stomachaches.  (Id.)

**2.    Weight Given to the October 2005 Opinion of the State-Agency Hearing Officer**

On October 11, 2005, S.S.K. appeared before M. I. Valladares, a state-agency hearing officer, as part of the continuing disability review process.  (T 52, 427)  Following a hearing, M. I. Valladares issued a written opinion that determined medical improvement had occurred as of May 2005, and S.S.K.'s current impairments did not meet or medically equal a listing.  (T 53-56)

S.S.K. was thirteen years old and in eighth grade at the time of the hearing.  (T 54)  S.S.K. testified that she had good grades and no behavior problems, she liked everything about school, and she related well with her teachers and classmates.  (T 53)  She took Ritalin, Seroquel, and Depakote daily, and the medications helped her to be good, pay attention, and do her school work.  (Id.)

When she was not in school, S.S.K. played outside, watched television, colored, and did puzzles.  (Id.)  She also did some household chores, including dishes, laundry, and cleaning her room (though her mother had to frequently remind her to clean her room).  (Id.)  She was able to prepare quick meals, such as T.V. dinners, and follow directions on the packaging.  (Id.)  S.S.K. had no problems getting dressed or brushing her teeth, but she needed help bathing because she confused the bathtub and shower faucets.  (Id.)  However, once that was resolved, she was able to bathe herself.  (Id.)

S.S.K.'s parents testified that they had to remind S.S.K. to shower, changes clothes, comb

her hair, use deodorant, and take her medications.  (Id.)  Sometimes she ignored her stepfather and did not do what he asked, but other times, she did things around the house without being told.  (Id.)

S.S.K.'s parents testified that S.S.K. was immature for her age and that she played with children much younger than her, but S.S.K. reminded them that she had at least three friends close to her age.  (Id.)  S.S.K. was aggressive with other children and with her parents when she did not get her way.  (Id.)  S.S.K. sometimes sucked her thumb, and she had recently written a letter stating that she wanted to cut herself with a knife because she did not like her life or the way people treated her.  (Id.)

The Ritalin helped, but it made S.S.K. moody, and she still had problems focusing and concentrating for more than twenty minutes.  (Id.)  S.S.K. was able to communicate well, but she had problems comprehending and following instructions.  (Id.)  Plaintiff stated that S.S.K.'s grades had dropped, but she admitted that she had not seen a report card or progress report for the current semester.  (Id.)  A March 2005 report from S.S.K.'s language arts teacher stated that S.S.K. did not have problems learning, relating with others, or staying on task.  (T 54)

A May 2005 report from S.S.K.'s math teacher reported that S.S.K. did not have a learning problem, but she had obvious problems paying attention when spoken to directly and working without distracting others.  (Id.)  She also had obvious problems expressing anger appropriately, respecting authority, and taking turns in conversation.  (Id.)  S.S.K. had slight problems following classroom rules and playing cooperatively with other children.  (Id.)  But she had no problems making and keeping friends, seeking attention appropriately, or asking permission appropriately. (Id.)

M. I. Valladares observed that S.S.K. was quiet at the hearing, but she was cooperative and

able to provide information in a relevant, organized fashion, and her testimony was consistent with her teachers' reports. (Id.) Finding that the severity of the limitations reported by S.S.K.'s parents was not fully supported by the record, M. I. Valladares concluded that medical improvement had occurred as of May 2005. (Id.)

The ALJ considered in detail the testimony received during the October 11, 2005 hearing as well as the written opinion of M. I. Valladares. (T 427-28) In particular, the ALJ noted inconsistencies in the parents' testimony and the lack of consistency in reports by S.S.K., her parents, and her treating physicians. (Id.) The ALJ concluded that the testimony of S.S.K.'s parents was not entirely credible and gave great weight to M. I. Valladares's opinion, agreeing with the conclusion that medical improvement had occurred as of May 2005. (T 428, 434)

Plaintiff argues that the M. I. Valladares's October 2005 opinion is not evidence on which the ALJ is permitted to rely because Plaintiff is entitled to a de novo review of the evidence. However, Plaintiff does not cite any authority for the proposition that an ALJ cannot consider the opinion of a state-agency hearing officer. The ALJ considered the October 2005 opinion along with the pertinent medical evidence of record and articulated the weight given to the October 2005 opinion and the reasons such weight was given. (T 425-34) Here, the ALJ developed a full and fair record by conscientiously exploring all relevant facts and stating specifically the weight accorded to each item of evidence and why she reached that decision. Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981). This issue does not warrant relief for Plaintiff.

**3.    ALJ's Functional Domain Findings**

    **a.    Acquiring and Using Information**

The domain of acquiring and using information considers how well the claimant acquires or

learns information and how well the claimant uses that information. 20 C.F.R. § 416.926a(g). An adolescent claimant aged twelve to eighteen should be able to use what he or she has learned in daily living situations without assistance. Id. § 416.926a(g)(2)(v). The claimant should be able to comprehend and express both simple and complex ideas using increasingly complex language. Id. Examples of limitations in this area include: (1) an inability to understand words of time, space, or size; (2) an inability to rhyme words or sounds; (3) difficulty recalling important things the claimant learned in school the prior day; (4) difficulty solving mathematics questions; and (5) the ability to talk only in short, simple sentences and difficulty explaining what the claimant means. Id. § 416.926a(g)(3).

The ALJ found that S.S.K. had less than marked limitations in acquiring and using information. (T 435) In making this finding, the ALJ relied on the results of the IQ and achievement testing by Mr. Yowell that showed S.S.K.'s intellectual functioning was in the borderline range and that she did not have a learning disorder. (T 220, 435) The ALJ also noted that S.S.K. displayed the ability to answer questions logically and coherently during multiple evaluations. (T 219, 274, 435, 556, 561) The ALJ pointed to S.S.K.'s statement that her grades were low because she did not want to do her school work as evidence of a problem with motivation rather a limitation in this domain. (T 435, 555)

Plaintiff contends that the ALJ failed to consider the evidence showing that S.S.K. had difficulty in school: for example, S.S.K. failed the eighth grade, functioned below grade level, received Ds and Fs, and was expelled from tenth grade for skipping class. (T 555, 597, 689)

However, the ALJ's decision discussed the evidence cited by Plaintiff relating to S.S.K.'s difficulties with school. (T 430, 432) But the ALJ concluded that S.S.K.'s difficulties were at least

partially attributable to a lack of motivation rather than limitations in this domain. (T 435) Additionally, the ALJ cited to objective evidence to support the finding that S.S.K. has less than marked limitations in acquiring and using information. (Id.)

Two evaluations found that S.S.K.'s intellectual functioning was at least in the borderline range. (T 220, 561) Multiple sources reported that S.S.K.'s thought processes were logical and coherent, her memory was intact, and her insight and judgment were good or fair.[9] (T 219, 232-58, 274, 526-27, 532, 541, 556, 561, 692) And all four state-agency examiners opined that S.S.K. had either no limitations or less than marked limitations in acquiring and using information. (T 225, 263, 565, 571) Consequently, substantial evidence supports the ALJ's finding that S.S.K. has less than marked limitations in the domain of acquiring and using information.

b.      **Interacting and Relating with Others**

The domain of interacting and relating with others considers how well a claimant initiates and sustains emotional connections with others, develops and uses language, cooperates with others, complies with rules, responds to criticism, and respects and takes care of the possessions of others. 20 C.F.R. § 416.926a(i). An adolescent aged twelve to eighteen should be able to initiate and develop friendships with children of the same age and relate appropriately to other children and adults. Id. § 416.926a(i)(2)(v). An adolescent should also be able to intelligibly express feelings, ask for assistance in getting needs met, seek information, describe events, tell stories, and begin to be able to solve conflicts with peers, family members, and adults outside the family. Id.

The ALJ found that S.S.K. had less than marked limitations in interacting and relating with

---

[9] Dr. Qadir found that S.S.K.'s insight and judgment were reduced though her intelligence was average and her recent memory was intact. (T 232-58, 541)

others.  (T 436) Plaintiff argues that the ALJ failed to consider evidence that S.S.K. has difficulties with aggression, respecting authority, playing cooperatively with peers, expressing anger, taking turns in conversation, and maintaining a good relationship with her family.  However, in making a finding with respect to this domain, the ALJ specifically noted that S.S.K. displayed aggressive behavior with other students and teachers, was suspended and expelled from school for inappropriate behavior and truancy, and her relationship with her family was poor.  (Id.)  Moreover, Plaintiff's contention that the ALJ failed to consider specific portions of the record is belied by the fact that Plaintiff's memorandum cites to sections of the ALJ's decision that discuss much of the evidence in question.

Plaintiff also challenges the ALJ's finding that S.S.K.'s social interactions improved significantly when she adhered to her medication regimen.  (Id.)  However, as discussed below, the ALJ's finding that S.S.K.'s condition improved with medication is supported by substantial evidence.

The record indicates that S.S.K. has some difficulties with anger, aggression, and getting along with others.  But two separate psychological evaluations described S.S.K.'s social life as somewhat active.  (T 219, 557)  And although she reported to Mr. Yowell that she had difficulty initiating and maintaining friendships, she also related that she had several friends at school.  (T 219)  The March 2005 report by S.S.K.'s language arts teacher stated that S.S.K. did not have a problem relating with others.  (T 54)  And the May 2005 report by her math teacher found that while S.S.K. had obvious problems respecting authority and taking turns in conversation, she had only a slight problem playing cooperatively with other children and no problems making and keeping friends, seeking attention appropriately, or asking permission appropriately.  (Id.)

Evaluations by Mr. Yowell and Dr. Galano noted that S.S.K. had no articulation problems. (T 219, 556-57) Ms. Sevlie's treatment notes describe S.S.K. as pleasant and her speech as normal. (T 274, 526-27, 532) Dr. Galano found that rapport was easy to establish, and S.S.K. displayed a full range of appropriate affects. (T 556-57) And Dr. Bursten reported that S.S.K.'s affect and mood were fully appropriate during the evaluation. (T 562) Lastly, three of the four state-agency examiners found that S.S.K. experienced less than marked limitations in this domain. (T 225, 263, 571) Therefore, the ALJ's finding that S.S.K. had less than marked limitations in interacting and relating with others is supported by substantial evidence.

### c. Caring for Yourself

The domain of caring for yourself considers how well a claimant can maintain a healthy emotional and physical state, fulfill physical and emotional needs in appropriate ways, cope with stress and environmental changes, and take care of his or her own health, possessions, and living area. 20 C.F.R. § 416.926a(k). This domain is characterized by a sense of independence and competence. Id. § 416.926a(k)(1)(i).

An adolescent aged twelve to eighteen may begin to experience significant physical changes that result in anxiety or worrying, but he or she should be able to start finding appropriate ways to express those feelings. Id. § 416.926a(k)(2)(v). Also, an adolescent should start to think seriously about future plans and what he or she will do after finishing school. Id. Examples of limitations in this domain include: (1) using self-soothing activities that demonstrate developmental regression (e.g., thumb sucking); (2) not dressing or bathing appropriately because of an impairment that affects this domain; (3) engaging in self-injurious behavior; (4) not spontaneously pursuing enjoyable activities or interests; and (5) disturbances in eating or sleeping patterns. Id. § 416.926a(k)(3).

The ALJ found that S.S.K. has no limitations in her ability to care for herself. (T 438) The ALJ acknowledged Plaintiff's testimony that S.S.K. was unable to perform her own personal care after she returned from foster care, but the ALJ found that this was a transitional condition. (Id.) Further, the ALJ found that while S.S.K. did not always bathe and dress appropriately, this was due to a lack of motivation rather than an inability to perform these activities. (Id.)

Plaintiff claims that in finding that S.S.K. has no limitations in this domain, the ALJ failed to consider the following evidence: (1) S.S.K. was hospitalized twice in 2007 for threatening herself and her parents with a knife; (2) in 2005, S.S.K. needed help performing her own personal care, including help operating the shower; (3) S.S.K. was observed sucking her thumb during two evaluations; (4) in November 2008, Dr. Ruano observed that S.S.K. was casually dressed and smelled of body odor; (5) S.S.K. told Dr. Galano that she had difficulty sleeping and a loss of appetite; (6) S.S.K. brings boys into her bedroom at night and has sex in the park and other places; (7) S.S.K. has problems with anger and attention deficits when she does not take her medication; (8) S.S.K. refuses to take her medication at times; (9) S.S.K. refuses to eat meals that are prepared for her; and (10) after S.S.K. comes home from school, she disappears and comes home between 8 p.m. and 1 a.m.

Contrary to Plaintiff's assertion, the ALJ considered all of the above evidence. In fact, in arguing that the ALJ failed to consider the evidence, Plaintiff's memorandum once again cites to sections of the ALJ's decision discussing the evidence at issue. Further, much of the evidence regarding Plaintiff's inability to care for herself is derived from the testimony of Plaintiff and Mr. Hayward, which the ALJ properly discredited, as discussed below. (T 434)

In any event, the testimony of Plaintiff and Mr. Hayward does not support the conclusion that

S.S.K.'s impairments interfered with her ability to care for herself. For example, although Plaintiff contends that S.S.K. would often refuse to take medication, Plaintiff testified at the June 8, 2009 hearing that "sometimes" S.S.K. spits out one of her medications, Concerta, because she claims that it gives her headaches. (T 730) Contrary to this testimony, S.S.K. and Plaintiff told multiple sources that S.S.K. was doing well on medication with no side effects. (T 260, 275-76, 278, 527, 534-37, 691)

Also, Mr. Hayward testified that S.S.K. refuses to eat food offered to her, but he also stated that after refusing food, S.S.K. takes food from the refrigerator. (T 744) Plaintiff had to teach S.S.K. how to care for herself after S.S.K. returned from foster care, but Plaintiff admitted that S.S.K. eventually learned to perform her own personal care. (T 718) During the October 2005 disability review hearing, S.S.K. said that she could prepare quick meals and perform household chores such as laundry, dishes, and cleaning her room. (T 53) Thus, the testimony supports the ALJ's finding that S.S.K.'s inability to care for herself was a transitional condition and that any lack of personal care was not the result of limitations in this domain. (T 438)

Nor do the medical records support a finding that S.S.K. had limitations in caring for herself although Dr. Ruano's November 21, 2008 progress notes state that S.S.K. was casually dressed and smelled of body odor, and Dr. Bursten's March 8, 2008 psychological evaluation indicates that S.S.K.'s hygiene and grooming were substandard. (T 561, 689) However, Dr. Ruano's treatment notes from August 7, 2008 and January 5, 2009 report that S.S.K.'s hygiene and grooming were either fair or good, and other sources also reported that S.S.K.'s hygiene and grooming were either fair or good. (T 218, 232-58, 528-31, 541, 556, 688, 692) The ALJ, not this court, is responsible for resolving conflicts in the evidence.

In 2007, S.S.K. was twice admitted to Lakeside Behavioral Healthcare for threatening her family and for being a danger to herself. (T 639-41, 663, 678) But at the time, S.S.K. was not taking her medication. (T 639, 644, 658, 661) And as discussed below, substantial evidence supports the ALJ's finding that S.S.K.'s condition improved with medication. (T 425) In March 2008, S.S.K. told Dr. Bursten that she had never tried to harm herself. (T 562) Moreover, medical sources consistently found no evidence of suicidal or homicidal ideation. (T 219, 232-58, 260, 267, 278, 532, 534, 536, 562) Thus, the medical evidence does not demonstrate a propensity for physical, self-injurious behavior that would limit S.S.K.'s ability to care for herself.

Three of the four state-agency examiners found that S.S.K. had no limitations in this domain.[10] (T 226, 264, 572) Although the regulations list thumb sucking as evidence of a limitation in this domain, the fact that two sources observed S.S.K. periodically sucking her thumb is not enough to disturb the ALJ's finding where it is otherwise supported by substantial evidence. This issue does not warrant relief for Plaintiff.

## 4.    ALJ's Consideration of the Longitudinal Record

The ALJ found that "[a] thorough review of the claimant's record evidence clearly shows a pattern of her doing well when she is compliant with treatment, including medication and therapy." (T 425) Plaintiff argues, however, that S.S.K.'s condition did not improve with medication and that the ALJ ignored evidence of the limitations that remained despite S.S.K.'s compliance with her medication.

The ALJ's decision considered Plaintiff's statements to Drs. Qadir, Inayat, and Galano that

---

[10] One of the state-agency examiners, Dr. Levasseur, did not evaluation the domain of caring for yourself. (T 566)

S.S.K. continued to experience difficulties in school and problems with anger despite her medication. (T 234, 236, 238, 240, 252, 254, 260, 426, 430, 554-56) However, the ALJ also discussed statements that Plaintiff and S.S.K. made to medical sources indicating that S.S.K.'s medication was helping. (T 260, 426, 432, 540, 689, 691) For example, July 5, 2005 progress notes by Dr. Inayat report that S.S.K. is less irritable and listens better when she takes medication, and missing one day of medication is a problem for S.S.K. (T 278, 534) August 7, 2008 progress notes by Dr. Ruano report that S.S.K. began experiencing problems with focus and anger after she ran out of medication. (T 691) And S.S.K. agreed with Plaintiff's assessment that when S.S.K. took her medication, she was focused, did not get angry, and listened well. (Id.) On November 21, 2008, S.S.K. told Dr. Ruano that she felt angrier since she had stopped her morning dose of Depakote. (T 689)

The ALJ also noted that when S.S.K. was admitted to Lakeside in 2007, she had not been taking her medication. (T 431-32, 639, 644, 658, 661) Mr. Yowell's March 2005 psychological evaluation opined that S.S.K.'s prognosis was fair with continued treatment. (T 220) And during her October 11, 2005 hearing before M. I. Valladares, S.S.K. testified that her medications helped her to be good, pay attention, and do her school work. (T 53, 427) In conclusion, the ALJ's finding that S.S.K.'s condition improved with medication is supported by substantial evidence.

Citing Lucas v. Sullivan, 918 F.2d 1567 (11th Cir. 1990), Plaintiff also argues that the ALJ failed to consider the reason for S.S.K.'s noncompliance with her medication. However, Lucas is distinguishable from the present case. In Lucas, the Eleventh Circuit held that the Commissioner may not deny SSI benefits on the basis of noncompliance with treatment unless it is shown that compliance would have restored the claimant's ability to work. Id. at 1572. Here, however, the ALJ

did not deny S.S.K.'s application on the basis of noncompliance with her medication.

Moreover, Plaintiff does not cite any evidence in the record showing that S.S.K.'s impairments preclude her from complying with treatment. During the June 2009 hearing, Plaintiff testified only that S.S.K. sometimes refuses to take medication because she claims it gives her headaches, not because her impairments affect her ability to take medication. (T 730) The ALJ properly found that S.S.K. has no limitations in her ability to care for herself, which indicates that her impairments are not so severe as to interfere with her ability to comply with treatment.

The ALJ did not err in failing to consider the longitudinal record as it relates to S.S.K.'s compliance with her medication, and this issue does not warrant remand.

**5.     Weight Given to Ms. Sevlie's February 2006 Assessment and Other Medical Opinions**

Medical opinions are statements from physicians, psychologist, or other acceptable medical sources that reflect judgments about the nature and severity of a claimant's impairments. Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1178-79 (11th Cir. 2011). A treating physician's opinion on the nature and severity of a claimant's impairments is generally given controlling weight if well-supported by medically acceptable clinical and laboratory diagnostic techniques and consistent with the other substantial evidence in the record. 20 C.F.R. § 416.927(d)(2). An ALJ must show "good cause" for not giving substantial weight to a treating physician's testimony. Phillips v. Barnhart, 357 F.3d 1232, 1240 (11th Cir. 2004). Good cause exists when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Id. at 1240-41.

Moreover, the ALJ must state with particularity the weight given to different medical

opinions and the reasons why such weight was given. <u>Sharfarz v. Bowen</u>, 825 F.2d 278, 279 (11th Cir. 1987) (per curiam). "In the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence." <u>Cowart</u>, 662 F.2d at 735.

Plaintiff argues that the ALJ erred by not giving substantial weight to the February 2006 disability assessment by Ms. Sevlie because Ms. Sevlie was acting on behalf of S.S.K.'s treating physician, Dr. Qadir. Ms. Sevlie's February 2006 assessment found that S.S.K. experienced: (1) marked limitations in acquiring and using information; (2) extreme limitations in attending and completing tasks; (3) extreme limitations in interacting and relating with others; (4) no limitations in moving about and manipulating objects; (5) marked limitations in caring for herself; and (6) less than marked limitations in health and physical well being. (T 280, 543) The ALJ considered Ms. Sevlie's February 2006 assessment and concluded that "[c]onsidering the overall record evidence from May 2005 forward, the undersigned is persuaded these opinions are not credibly supported, particularly when the evidence is viewed longitudinally. (T 430)

Nurse practitioners are considered "other sources" under the regulations, <u>see</u> 20 C.F.R. § 416.913(d)(1), and as such, their opinions are not due controlling or substantial weight like those of treating physicians. In this case, however, it is significant to note that Ms. Sevlie's assessment appears twice in the record, and the second copy of the assessment bears a stamp with Dr. Qadir's signature.[11] (T 543)

Even if the February 2006 assessment should be considered a treating physician's opinion,

---

[11] In discussing the February 2006 assessment, the ALJ's opinion referenced exhibit 13F/2, which is the copy of the assessment that is not stamped with Dr. Qadir's signature. (T 280, 430)

see <u>Daughtry v. Barnhart</u>, 347 F. Supp. 2d 1135, 1140 (M.D. Ala. 2004), the ALJ provided good cause for not giving the opinion controlling weight by finding that it was not supported by the evidence. The ALJ's findings that S.S.K. had less than marked or no limitations in the domains of acquiring and using information, interacting and relating with others, and caring for herself are supported by substantial evidence. And although the February 2006 assessment assigns S.S.K. extreme limitations in attending and completing tasks, Ms. Sevlie's treatment notes regularly evaluate S.S.K.'s concentration and memory as fair. (T 274-76, 526-27, 532) Ms. Sevlie's notes from February 29, 2007 and July 3, 2007 state that S.S.K.'s thoughts were clear and that S.S.K. was focused and attentive. (T 526-27) Dr. Qadir's notes consistently evaluate S.S.K.'s intelligence as average and her memory as intact. (T 232-58, 541) Testing by Mr. Yowell found no evidence of a learning disorder, and Dr. Bursten observed that S.S.K. did not display any attention deficits or hyperactivity. (T 220, 561-62)

Plaintiff also contends that the ALJ's statement of the weight given to the medical opinions of record is insufficient for the court to determine whether the ALJ's decision was based on substantial evidence.

After thoroughly considering the medical evidence of record, the ALJ's decision attributed "considerable weight" to the reports and opinions of the evaluating psychiatrists and psychologists and the treating physicians. (T 434) Prior to making this finding, the ALJ fully developed the record by discussing the pertinent elements of the available opinion evidence. (T 425-34) Further, the opinion evidence supports the ALJ's findings as to three functional domains challenged by Plaintiff. The ALJ's decision is supported by substantial evidence.

In sum, the ALJ sufficiently explained the weight given to the medical opinions in the record,

and this issue does not warrant relief for Plaintiff.

**6.      Testimony of Plaintiff and Mr. Hayward**

The Eleventh Circuit has established a three-part "pain standard" to use when a claimant attempts to establish disability through testimony of pain or other subjective symptoms.  Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991) (per curiam).  A plaintiff must show: (1) objective medical evidence of an underlying medical condition; and either (2) the objective medical evidence substantiates the severity of the pain from the condition; or (3) the objectively determined medical condition is of sufficient severity that it would be reasonably expected to produce the pain alleged.  Landry v. Heckler, 782 F.2d 1551, 1553 (11th Cir. 1986) (per curiam).

Where an ALJ declines to credit a claimant's testimony regarding subjective complaints, the ALJ must "articulate explicit and adequate reasons for doing so."  Foote v. Chater, 67 F.3d 1553, 1561-62 (11th Cir. 1995) (per curiam).  A clearly articulated credibility finding that is substantially supported by the record will not be overturned.  Id. at 1562 (citation omitted).

On April 16, 2009, Plaintiff and Mr. Hayward appeared for a hearing before the ALJ without S.S.K.  (T 693, 696)  Plaintiff explained that S.S.K. ran away the night before the hearing because she thought that Plaintiff might be attempting to commit her to a facility.  (T 696)  As a result, the ALJ agreed to continue the hearing to a later date.  (T 700)

On June 8, 2009, Plaintiff and Mr. Hayward appeared for a continued hearing.  (T 703)  Again, S.S.K. was not present; Plaintiff and Mr. Hayward had been unable to locate S.S.K. since the time of the first hearing.  (T 705-06)  The ALJ went forward with the hearing without S.S.K. and received testimony from Plaintiff and Mr. Hayward.

Plaintiff testified that S.S.K. starting having behavior problems after she was abused by her

biological father at eight years old. (T 709-10) S.S.K. also witnessed her father abusing Plaintiff when S.S.K. was as young as six years old. (T 710) Plaintiff admitted to using cocaine while pregnant with S.S.K. and suspected that in utero exposure might be a contributing factor to S.S.K.'s impairments. (T 711) Plaintiff lost custody of S.S.K. when she was about nine years old and regained custody about two years later. (T 710-11) S.S.K.'s father was eventually incarcerated, and S.S.K. did not have any contact with him after that time. (T 711-12)

S.S.K. has continued to experience behavior problems since returning from foster care. (T 712) She receives poor grades at school, curses at teachers, and does not pay attention or stay focused. (Id.) S.S.K.'s behavior problems have only gotten worse since S.S.K. returned from foster care. (Id.) Plaintiff had to teach S.S.K. how to bathe, brush her hair, and dress herself. (T 718) S.S.K. eventually learned to take care of her own grooming and hygiene, but Plaintiff continued to occasionally assist her. (T 719) Then, in 2008, S.S.K. abruptly stopped taking care of herself altogether. (T 718-20) S.S.K. claims that she does not know how to dress herself and asks for Plaintiff's help. (T 722-23) S.S.K. sometimes spits out her Concerta medication because it gives her headaches. (T 730)

S.S.K. failed eighth grade and was sent to a behavioral school called CEP. (T 714) In eighth grade, S.S.K. pulled a knife on another girl and threatened to kill herself and the other girl. (T 716) She also stuck a boy with a pen or pencil. (T 716-17) In ninth grade, S.S.K. was suspended for fighting with teachers, and in tenth grade, she was expelled from school. (T 715-16) Although S.S.K. was expelled from school in the fall of 2008, Plaintiff testified that S.S.K. threatened to kill another student in January 2009. (T 716-17) S.S.K. has also pulled a knife on Plaintiff, Mr. Hayward, and her little brother. (T 717, 730)

In January 2008, S.S.K. began sneaking boys into the house every night. (T 721-22) Some nights, she brings as many as twelve boys into the house. (T 721) S.S.K. has sex in her backyard and in a park, among other places. (T 723-24)

Mr. Hayward testified that he has known Plaintiff for about fourteen or fifteen years, and he has lived with her for about twelve years. (T 735) Mr. Hayward met S.S.K. when she was about three years old. (Id.) Like Plaintiff, Mr. Hayward testified that S.S.K. cannot not take care of herself, is sexually active, and shows aggression towards family and classmates. (T 737-40, 743-45) S.S.K. argues with her parents and does not want to clean up after herself. (T 744) S.S.K. refuses food when it is offered to her, and she waits until night to take food from the refrigerator. (Id.)

Mr. Hayward has had to remove S.S.K. from volatile situations in which she was threatened by other girls. (T 739, 742) Mr. Hayward described an incident where he found money given to S.S.K. by a boy, and the boy threatened Mr. Hayward with a gun and directed him to return the money to S.S.K. (T 742-43) After S.S.K. and her family moved to Tampa in 2008, S.S.K. and her friends broke into the family's former apartment, and as many as fifty people occupied the apartment that night. (T 740-41)

After considering the testimony of Plaintiff and Mr. Hayward as well as the medical evidence of record, the ALJ found that S.S.K.'s medically determinable impairments could reasonably be expected to produce the symptoms alleged. (T 434) However, the statements concerning the intensity, persistence, and limiting effects of S.S.K.'s symptoms were not credible to the extent that they are inconsistent with the finding that S.S.K. does not have an impairment or combination of impairments that functionally equal a listing. (Id.) Further, the ALJ gave "little weight and credibility to recent subjective allegations of the claimant's parents, as they are not adequately

supported by record evidence." (Id.) The ALJ concluded that the testimony offered at the June 9, 2009 hearing portrayed a remarkably different individual than the treatment notes and other reports described. (Id.) The ALJ also noted the possibility of secondary gains for Plaintiff if S.S.K. were found disabled.

Plaintiff argues that the ALJ did not apply the correct standard in discrediting the testimony of Plaintiff and Mr. Hayward. First, Plaintiff argues that it was an error for the ALJ to characterize the testimony as subjective because Plaintiff and Mr. Hayward actually witnessed the events they described at the hearing. Second, Plaintiff submits that the testimony regarding threats S.S.K. made towards her family need not be supported by the evidence as there generally will not be documentation of events that occur in a claimant's home. Lastly, Plaintiff takes issue with the ALJ's inference that the possibility of secondary gains influenced Plaintiff's testimony.

An ALJ may consider the testimony of a claimant's family members as evidence of a claimant's symptoms. See Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983) (per curiam); 20 C.F.R. § 416.913(d)(4). The issue is whether the ALJ's credibility finding as to the testimony of the family members is supported by substantial evidence. Tieniber, 720 F.2d at 1254-55. Whether such testimony is labeled as subjective is of no moment to this determination.

The testimony presented at the June 2009 hearing portrays S.S.K. as a defiant and impulsive individual who cannot take care of herself. However, the medical evidence supports the ALJ's findings that S.S.K. has less than marked or no limitations in interacting with others and caring for herself. Multiple sources evaluated S.S.K.'s insight and judgment as fair or good. (T 274, 526-27, 532, 692) Dr. Qadir, Dr. Inayat, and Ms. Sevlie all described S.S.K. as pleasant. (T 260, 274, 532, 535, 537) Dr. Galano found that it was easy to establish rapport with S.S.K., and she displayed a full

range of appropriate affects. (T 556-57) And Dr. Bursten reported that S.S.K.'s affect and mood were fully appropriate during the evaluation. (T 562) In May 2007, S.S.K. denied that she was sexually active. (T 555) Based on the foregoing, the ALJ reasonably concluded that the testimony presented at the June 2009 hearing was inconsistent with the evidence. (T 434)

The ALJ's decision also noted that the testimony presented at the June 2009 hearing conflicted with other evidence in the record and that Plaintiff made inconsistent statements to medical sources. For example, during the June 2009 hearing, Plaintiff testified that S.S.K. was abused by her father when she was eight years old, but this age is inconsistent with the age reported for such abuse elsewhere in the record. (T 433, 709-10) Also, Plaintiff testified that she used cocaine while pregnant with S.S.K., but she told Dr. Ruano that her pregnancy with S.S.K. involved no in utero exposure. (T 432, 691, 711) During Dr. Galano's May 2007 evaluation, Plaintiff stated that S.S.K.'s therapy was effective, but then she denied that the therapy affected S.S.K.'s behavior. (T 430, 555) And although Plaintiff told Mr. Yowell that she had five other children who were adopted at birth due to her cocaine use, Plaintiff told Dr. Galano that all of her children were diagnosed with bipolar disorder and ADHD. (T 217, 430, 555-56)

The ALJ should not have drawn an adverse inference from the possibility that Plaintiff might benefit if S.S.K. were found disabled as nothing in the record supports this conclusion. However, such inference is at most a harmless error as the ALJ's credibility finding is otherwise supported by substantial evidence. See Allen v. Sullivan, 880 F.2d 1200, 1202-03 (11th Cir. 1989) (per curiam); Patterson v. Bowen, 799 F.2d 1455, 1459-60 (11th Cir. 1986). Remand on this issue is not warranted.

7.      **S.S.K.'s Testimony at the June 2006 Hearing**

On June 26, 2006, Plaintiff and S.S.K. appeared for a hearing before the first ALJ. (T 378) At the time of the hearing, S.S.K., fourteen years old, was preparing to repeat the eighth grade. (T 383) S.S.K. testified that she was repeating the eighth grade because of poor attendance and bad grades. (Id.) S.S.K.'s poor attendance was caused by fatigue and daily headaches that sometimes affected her ability to do school work. (T 383-84, 392)

Although she did her homework, she received poor grades because she did not study for tests. (T 384) She studied for her favorite subject, social studies, and received a B in that class. (T 385) She did not get along with her science, math, language arts, and band teachers, and she received three Fs and a C in those classes. (T 391) According to S.S.K., her medication caused her to sleep in classes that she did not like. (T 391, 394-95) She was not enrolled in special education classes, and she was not suspended from school during eighth grade. (T 386-87)

S.S.K. had friends at school, but she preferred not to socialize with friends outside of school. (T 385-86) S.S.K. lost her best friend after they got into a fight. (T 393, 395) S.S.K. did not play a sport, but she played drums in the band during sixth, seventh, and eighth grades. (T 387) In her free time, S.S.K. watched T.V. or went outside to play games, such as dodge ball. (T 389)

S.S.K. joined the boys and girls' club, but she was kicked out after she stabbed a boy with a pen and threatened to punch him. (T 393-94) The boy did not require medical attention after S.S.K. stabbed him. (T 395) S.S.K. stabbed the boy because he threatened to flatten the tires on S.S.K.'s bicycle, and she punched him because he pushed her. (T 395-96)

Plaintiff combed S.S.K.'s hair, bathed her, and dressed her. (T 388) S.S.K. explained that she did not like to comb her hair, bathe, or dress herself, but she admitted that she had the ability to dress herself. (T 388-89) Plaintiff picked out S.S.K.'s clothes when the two went shopping, but

S.S.K. was not sure why.  (T 386)

S.S.K. performed some household chores, such as washing dishes.  (T 390)  S.S.K. washed the dishes every day, but Plaintiff had to frequently remind her to do them, and sometimes she did not finish the dishes after starting them.  (T 397-98)

The ALJ's decision did not discuss S.S.K.'s testimony from the June 2006 hearing, and Plaintiff contends that such omission is a reversible error.  However, the ALJ's decision addressed the substance of S.S.K.'s testimony in the process of considering the medical evidence of record and the testimony presented by Plaintiff and Mr. Hayward at the June 2009 hearing.

The ALJ acknowledged the testimony of Plaintiff and Mr. Hayward that S.S.K. fought with teachers and other students, her medication gave her headaches, and she was dependent on Plaintiff to take care of her.  (T 433)  The ALJ's decision also discussed testimony from the October 11, 2005 hearing before M. I. Valladares that reported S.S.K. was kicked out of the boys and girls' club for stabbing a boy.  (T 427)   Regarding S.S.K.'s difficulties at school, the ALJ considered: (1) statements made to Dr. Qadir that S.S.K. had problems with school; (2) Dr. Galano's May 2007 evaluation that reported S.S.K. received Ds and Fs in school, fought at school, and was repeating eighth grade; (3) Dr. Bursten's March 2008 evaluation that noted S.S.K. was receiving failing grades at school and had behavior problems that included skipping class and cursing at teachers; and (4) Dr. Ruano's November 21, 2008 progress notes that indicate S.S.K. was expelled from tenth grade for skipping school.  (T 426, 430-32)

The ALJ has a duty to develop a full and fair record.  Cowart, 662 F.2d at 735.  However, "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision" so long as the decision considers the claimant's medical condition as a whole.  See Dyer

v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (per curiam).  Moreover, although the ALJ has a duty to develop a full and fair record, there must be a showing of prejudice to warrant remand. Robinson v. Astrue, 365 F. App'x 993, 995 (11th Cir. 2010) (per curiam) (unpublished) (citing Brown v. Shalala, 44 F.3d 931, 935 (11th Cir. 1995) (per curiam)).

S.S.K.'s testimony from her June 2006 hearing is consistent with statements made elsewhere in the record and considered by the ALJ.  The ALJ's decision adequately considered S.S.K.'s condition as a whole, and as a result, Plaintiff cannot show that she was prejudiced by the ALJ's failure to discuss S.S.K.'s June 2006 testimony.  Accordingly, this issue does not warrant remand.

## Conclusion

The ALJ's decision is supported by substantial evidence and the proper legal principles.  The decision of the Commissioner should therefore be affirmed.

Accordingly and upon consideration, it is **RECOMMENDED** that:

(1)     The decision of the Commissioner be **AFFIRMED** and the case **DISMISSED**, with each party to bear its own costs and expenses; and

(2)     The Clerk of Court enter final judgment in favor of Defendant consistent with 42 U.S.C. §§ 405(g) and 1383(c)(3).


**Date: January 6, 2012**

ELIZABETH A JENKINS
United States Magistrate Judge

## **NOTICE TO PARTIES**

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of this service shall bar an aggrieved party from attacking the factual findings on appeal.  See 28 U.S.C. § 636(b)(1).


Copies to:
Counsel of Record
District Judge